Case number 318-0578, People of the State of Illinois v. Darren Hardiman. Ms. Matuszak? Yes. Okay, you may proceed. Thank you, your honor. May it please the court, counsel. My name is Melissa Matuszak. I represent Darren Hardiman, who is the appellant in this case. Mr. Hardiman's conviction was based solely upon circumstantial evidence. There was not one witness who identified Hardiman as the shooter. He did not admit to shooting the victim. And there is no physical evidence actually connecting Mr. Hardiman to the shooting. And Mr. Hardiman was also convicted of unlawful possession of a weapon by a felon. The state confessed error on that issue based on Aguilar, and so we'll rest on our brief on that issue. We did raise several issues in our brief, but today I want to focus on the issue of probable cause for arrest. And I will, of course, try to answer any questions that your honors have about other issues in our briefs. So the police did not have probable cause to arrest and interrogate Mr. Hardiman. And the fruits of that illegal arrest, namely Mr. Hardiman's statement that he was present at the scene in a specific car at the time of the shooting, should have been suppressed. In this case, the police issued a so-called 49 message, which is an internal police finding of probable cause for arrest. They did not get a warrant. And they did this and arrested Mr. Hardiman after they interviewed a man named TC Driver, who was the sole witness, not at trial, but in the police investigation, he was the sole witness to name Mr. Hardiman as the shooter. But the police did not have probable cause here because the information provided by Mr. Driver regarding what happened on the night of the shooting was demonstrably false based on all of the other evidence that the police had gathered during their information, what was known to them prior to their interview with Mr. Driver. So prior to Mr. Hardiman's warrantless arrest, the police had three sources of information in their investigation. One, the evidence that was gathered and the statements that were taken at the scene of the crime immediately after the shooting. Two, surveillance video from the scene of the crime. And three, at the police station, statements of a gentleman named Anthony Carter and TC Driver, when they were interviewed, was several hours after the shooting on the morning of February 7th at the police station. So from the scene, the police learned that an anonymous person gave a security guard a scrap of paper that had a vehicle make, model, and license plate number. It was a Mitsubishi Eclipse that they described as a black Mitsubishi Eclipse. That person allegedly told the security guard, who then told the police, that that was the shooter's vehicle, the Mitsubishi Eclipse, and it was parked on the street near the club. The police also learned that there were shell casings in the parking lot of the club and bullet holes in the building of the club that showed that the shooter must have fired from the area of the parking lot toward the club and toward the victim. They learned that there were 17 shell casings recovered. And shortly after the shooting, still at the scene, a security guard named Early Johnson told the police that the victim had been in an argument earlier in the evening with a person that he only described as an African-American male who was dark-complected. And Mr. Johnson told the police that after the argument, he escorted both of the parties out of the club. From the surveillance video, the police learned that the shooter exited a dark-colored vehicle that was parked far into the parking lot at the club. Minutes later, the shooter stood in the parking lot and shot toward the building. The video clearly shows that the shooter's arm was outstretched, fully extended while shooting. And then after the shooting, the shooter walked back to a vehicle and got in the passenger side and left the parking lot. Now, hours later at the police station, the police interviewed a man named Anthony Carter. The police learned that Carter was in fact the owner of the black Mitsubishi Eclipse, identified by the anonymous person on the scrap of paper. And also that on the day of the shooting, Carter had loaned his vehicle to T.C. Driver. So at this point, there is absolutely zero information that Mr. Hardiman was even present at the scene. But then the police interviewed T.C. Driver. Driver told the police that he was at the club with someone named Scooby, who he then identified as Mr. Hardiman. And again, no one else had identified Mr. Hardiman. This was the first the and Driver told police that he walked in to the bathroom, walked in on an argument between Hardiman and Hartwell, the victim, and that after the argument, they sort of went their separate ways. Hardiman went to the dance floor. Driver went to the bar. Hartwell went somewhere. He didn't see him. And then Hardiman and Hartwell stayed in the club for some time until closing time. And then they left the club. Now, this was a complete contradiction of Mr. Johnson's statement to the police that there was an altercation in the bathroom. He broke it up and he escorted  Council, can I stop you there? I just have a question of fact. In reading your statement of facts, it states that Mr. Johnson separated the men in the bathroom and then lost sight of Mr. Hardiman. Is that correct? That is correct. And then he didn't escort them out together or did he? Well, so the record is a bit unclear about the timing. He testified that he lost track of Mr. Hardiman, but then found him again. He lost track of the man that was involved in the argument in the bathroom and then he escorted Mr. Hardiman out, but he did not maintain eye contact with the man that argued in the bathroom until the time he escorted him out. Correct. And that was how he testified at trial. At the suppression hearing was the testimony of Johnson told police that there was an argument in the bathroom and that afterward he escorted the parties out. Okay. Thank you. So after the argument or after the club closed, driver told police that he and Hardiman left the club. And then as soon as they walked out the exchanged words right outside the front door and Hardiman just pulled out a gun and shot Hartwell twice. Now from the surveillance video, the police knew that the shooter was in a car, exited the car, approached the club, and then several minutes later started shooting. Okay. Then driver also told the police that he saw two shots. Then as he walked to the car, he heard three to four more shots. And he was asked about this several times during his interview, and he was very clear. That's what he heard and saw. And the police knew that there were significantly more shots than that. There were at least 17 shots fired. Perhaps a minor point, but I would submit not. Driver told the police that the shooter just sort of casually raised his arm and shot Mr. Hartwell. And the police, again, questioned him several times on this. That, you know, wasn't it true that the shooter held his arm, extended it fully while he was shooting? And Mr. Driver insisted that no, he did not. And we know that the shooter did not. We know that that's not true from the surveillance video. And critically, you know, driver told police that he was very specific. He went through the whole scenario. He told the police that they walked out the front door. He was standing next to Hardeman with his back to the wall of the club. And he sort of demonstrated for the police. And Hardeman was shooting from that vantage point. So according to driver, it was right outside the front door, the shooting, and the shots were going away from the club. So if that were the case, you would expect to find shell casings and things right there at that spot, right outside the front door, and perhaps bullet holes in vehicles or something toward the parking lot. But the police knew because officers on the scene right after the shooting found the shell casings in the parking lot, you know, where the shooter was as seen on the surveillance video. They found shell casings in the parking lot, and they found the victim shot who was standing toward the club, right outside the club, and also bullet holes in the building. So the police knew at that time that the shooter approached the parking lot or approached the building from the parking lot and started shooting toward the building, not the way that driver explained what he claims happened. Where was driver's car? Where was driver's car? Yes. It was, according to driver, it was in the parking lot at the far back end of the parking lot. So we have a car in the parking lot as well that places the defendant, right, in the parking lot with a car? Well, according to driver. Yes. Yes, yes, yes, correct. Shell casings are found in the parking lot. The shell casings are found in the parking lot, but if we're talking about what the, you know, the police investigation at that time, what they knew was that there was a vehicle identified. Driver said that he was driving the vehicle. According to driver, Hardeman was with him. But then the actual, the story of how this shooting actually occurred was not at all supported by the physical evidence by, as your honor says, the shell casings in the parking lot. They weren't in the parking lot and near the front door. They were only in the parking lot. They had already collected that information, right, from the video footage and from other interviews that they've conducted right at the scene? Well, yes, from the video footage and also just from the physical evidence, you know, the police were there collecting the, you know, marking the shell casings and looking at the building. And so they knew, they knew where, you know, based on their experience, I'm sure as investigators, they knew that that was evidence that the shooter was standing in the parking lot, not right outside of the front door of the club, like Mr. Driver, you know, gave great detail that he was right outside the front door. So they knew that driver's story about what actually happened was not true. It was not supported by any of the other evidence that the police had gathered at that point. To simplify it, you're saying the contradiction is Driver's statement that Hardiman was outside the front door when the shooting occurred? Correct. The physical evidence of an investigation shows outside the front door, a dead victim, but the shells are back in the parking lot? Correct. And so what Driver told the police, that they walked out the front door and had this confrontation, and Hardiman just pulled out a gun and started shooting, could not be true. Unless there's a time difference and Hardiman goes back to the car at the parking lot and comes out firing. Perhaps, but that's not what Driver said. True. I said it's a contradiction. Sure. Yes. Correct. Counsel, I have another question for you based on the record, just trying to get my facts straight. Could you identify Mr. Hardiman in the video footage from the club? No, Your Honor. So the only identification of Mr. Hardiman came from Mr. Driver? The only identification at... Before the 49 message went out? Correct. So Mr. Johnson identified Hardiman after Mr. Hardiman was arrested? Correct. Mr. Johnson had nearly identified... They didn't have Mr. Johnson's identification of a photo saying, this is Hardiman, the man that I escorted out before the 49 message went out? No. And my... So the only person linking Hardiman to the shooting is Driver? Correct. Ironically, Driver was the driver of the getaway car. Correct. According to Driver. Yes. So how do you have probable cause based on an identification by a co-defendant or an accomplice? Isn't that inherently suspect? I believe that it is. We, of course, don't know Mr. Driver's motivations, but I would submit that he had a great motivation to sort of shift blame to someone else. I have one more housekeeping notation on page five of your brief. You talk about the stipulation. Let me get back to that. Your client was arrested on February 8th, 2011. And then on page eight, you say that he was arrested at 7.30 in the morning on February 11th. Is that a typographical error? It is. And I apologize, Your Honor. I believe I clarified that in our reply brief. Okay. It's significant to me because Johnson's identification by photo, and I don't know if it was photo lineup or a single photo, was on the 10th. And thank you. Yes. Mr. Hardiman was arrested on February 8th. In the early morning hours, I believe it was around seven o'clock in the morning on February 8th. I do not know whether or not the photographic lineup was indeed a multiple photo lineup or a single photo. The record is silent on that. Okay. That helps me. Thank you. Thank you. Your time is up, Ms. Patuzak. You'll have time in reply. Okay. Thank you, Your Honor. Mr. Atwood, you may respond. Good morning, Your Honor's counsel. May it please the court. My name is Nicholas Atwood, and I represent the people of the state of Illinois in this matter. As one housekeeping issue before I begin, in August, defendants supplemented the record with the exhibit of TC Driver's interview. We actually never received that DVD. Apparently, the court transferred that directly to the justices. And so I'd like to ask the court for leave to review that DVD and to file a response in writing after the oral argument is completed. Did you proceed by motion for that request? Not yet. We just discovered that we didn't have the DVD during the holiday, and we confirmed with the court on Monday that it had been sent to the justices chamber. So I will write that up if you would like. Well, I think the motion practice would be appropriate in that instance, and the court can look at it. Certainly. Turning now to the issue, I'll start with the issue of probable cause, but I'd also like to briefly touch on the alert. Defendant makes a lot of references to driver's statements. And what we know about the probable cause, the police responded to the scene after the shooting. Security guard Early Johnson spoke to the officers, and he informed them about an altercation that had occurred. The officers also spoke to another security guard who informed them that there had been a witness to the vehicle that left the scene, the black Mitsubishi Eclipse. That vehicle was identified, and that witness had also provided a license plate number. The license plate number led to Anthony Carter, who stated that he had let TC driver and a man named Scoob borrow the vehicle that day. This is the first notification we have of the second individual. That second individual, when driver came in to speak with the police, Carter brought driver with him to be interviewed at the station. Driver informed police that defendant is actually Scoob. At that time, and this is approximately 24 to 36 hours after the shooting, driver said defendant was with him at the club. Defendant had an altercation in the bathroom of the club, and the defendant was the individual who shot the victim in this case. We know that the altercation occurred because Early Johnson had told police that there'd been an altercation in the bathroom, and that he had had to escort some individuals out. We later found out from Johnson that he identified the defendant as the individual who had been in the altercation. He did that in an in-person lineup. That happened after the arrest, but before the arrest, the officers were aware of the crime. They had a trail of breadcrumbs, if you will, to Anthony Carter, who led them to driver, who stated that he was there with the defendant, and the defendant was the shooter. All that information checked out. You're saying, Mr. Atwood, you're saying the probable cause began when? With the interview with driver? Correct. The probable cause began with the interview with driver. Driver, we know, he stated to the police that during the altercation that occurred between the two, and Early Johnson spoke about another individual who was in there, which we presume is driver, in the club bathroom. Johnson stated that this individual was trying to calm down the agitated individual who we later found out was defendant. What we know from that information is that defendant had a motivation to shoot Hartwell. He, in fact, said when he got kicked out of the club that night by Johnson, he was going to either light the bitch up or air this bitch out, which Johnson testified to meant that he was going to bring a gun to the scene. Now, let's erase all of that stuff, okay? Is there enough probable cause when you have driver saying to the police in an interview that Hardiman shot the man? Yes, there is enough probable cause for that because the material facts are there. Defense counsel pointed out... Why are we messing this up with all this other stuff in the bathroom? Well, I'm sorry, I didn't hear you clearly. Why are we messing all of this up with all the stuff in the bathroom? The bathroom just provides the motivation for why there was a shooting in the first place. It places the defendant at the scene because Johnson identified the defendant later, and it shows what happened. It starts off a series of events that leads to the shooting. I guess I'm asking, is all of that essential, or is that just noise? With respect to the argument, I would argue that it is essential because it shows us how we got there. With regard to the shell casings that defense counsel mentioned, she makes an important point about, well, there were some bullet marks on the wall, there were shell casings in the parking lot. But if you look at exhibit page 25, there are shell casings on the parking lot, but there are also shell casings within one or two feet of the front and side door of the parking lot. There are yellow markers clearly there in the snow. Another thing that counsel had referenced was the fact that a driver saw the defendant point the gun a certain way. All we know from what driver's statement was initially to the police is that he saw the defendant fire two shots, then he turned around and walked away and heard additional shots. We know there were a total of about 17 shell casings found, so there were a series of additional shots. But those facts were also confirmed by the other witness, Talika Liles, who was the anonymous witness initially, but who gave the security guard the envelope. So you're telling me that shell casings are found inside the doorway of the front door, am I correct? They're not found inside the doorway, they're found immediately outside the doorway, and driver never testified. Okay, there was a proximity then to the doorway, correct? Within a matter of a couple of feet. And if I recall driver's statement was- I'm sorry, I'm still talking. Then there's a trail of shell casings going to the parking lot. Is that the image you're giving to us? That's correct. Okay. One of the things that driver had mentioned, we don't know- he didn't state that the defendant shot the victim inside the front door. We just know it happened in the vicinity of the front door. And based on what we saw, the defendant's or the victim's resting place was outside the front door in a fetal position. So it's not as if this shooting happened inside the doorway of the club. It's apparent that Hartwell exited the club and was then fired upon after he exited the front door. And shooting allegedly by the shell casings at the crime scene were found going towards the parking lot, am I correct, and found in the parking lot? They were found in the parking lot and they were found in the vicinity of the front and side door. I'm not sure the order in which those shots were fired. No, but nobody, even ballistics, won't tell you that. But there is a trail. So that one hypothetical is the shots were fired as he exited the door. And then, of course, these people have a propensity to keep their finger on the trigger, okay, and are walking back. Apparently it's agreed upon there's 17 shots fired towards- Correct. And it was some- Is that the image that is being given to the police by the testimony of Driver? Driver stated there was an initial couple of shots fired and then there were additional shots that were fired. Talika Lyles later testified that there were a number of shots fired essentially until the gun ran out of ammunition. So we did know there was a first volley and then a subsequent volley. But it's also plausible that Driver didn't hear how many total shots were fired because as he stated to the police, he walked back to the vehicle and got inside the vehicle and started the car. Shortly thereafter, we see the individual in the parking lot walking past Lyles' vehicle and entering the passenger side. One thing that- I don't mean to be disrespectful, but why isn't it equally plausible that Driver was the shooter? Based on the information that we had, he had no motivation to do the shooting. As I mentioned, Johnson stated that the other individual in the bathroom was trying to calm the agitated individual down. Did he identify that person as Driver? He didn't identify that individual, but Driver placed himself there in the bathroom with the defendant. I have a question about the 49 message. It was actually Detective Batterman that took Mr. Hardiman into custody. Was Detective Batterman part of this investigation or was he relying solely on the 49 message? I believe he was relying on the message. I don't recall his specific involvement. I know Officer Moore was primarily involved in the investigation, but there were a number of officers collecting that information. However, as the case law would say, all the officer's knowledge is imputed to one another. So he's acting on the collective knowledge of all the officers when he makes that arrest. Well, that 49 message in Peoria County is a message indicating that the person is wanted for questioning only. Isn't that true? I believe the testimony from Moore was that it was a probable cause message, but I'm not certain to what the extent of that would be. But even if that message is just an administrative function, that message in and of itself carries no weight. The only thing that matters is the evidence that the police know prior to the issuance of that alert. It's really no different than a be on the lookout message. They just know that there's an individual who's potentially wanted for a crime, and our whole position has been that there was sufficient probable cause leading up to the arrest to support that. Well, the 49 message indicates that somebody is wanted for questioning, but you don't need a probable cause to question, do you? No, you do not. So you want to have us look backwards, not on what Mr. Batterman or Detective Batterman knew, but look backwards at that point in time where the investigation was in order to determine whether there was probable cause? That is correct. That's what the case law allows for. The case law allows all the collective knowledge of those officers to be imputed to one another in order to effectuate an arrest. So why the emphasis on the Bass case and the Brassfield case? I might have the names wrong. I'm talking about the probable cause in the message dispatched to the arresting officer. Why are those cases even relevant then? Well, those cases were raised by defense counsel. I would argue initially that they're not relevant because the Bass case, for example, which is currently before the Supreme Court, that case was sort of raised sua sponte, that issue by the justices in the first district. It wasn't an issue that was briefed by either of the parties. The justices wanted to hear argument on the issue of the probable cause alert, the 49 alert, and determine whether or not that was constitutional, not under the U.S. Constitution, but under the Illinois Constitution. You've asked us to hold off rendering a decision until the Bass case is decided by our Supreme Court. Are the messages received by the officer in Bass the same type of message as the 49 message here? Because Justice Hyman, when he wrote Bass, said they searched extensively and could not find any other probable cause-like message that is state. And when I look at the description of what a 49 message is, I think there's a difference. 49 messages only be on the lookout for somebody who's wanted for questioning. So I'm not sure. I'd like you to discuss why we should hold off deciding this case until Bass is decided, because I don't think the messages that Officer Batterman acted on is the same type of message that the officer acted on in Bass. Well, this court could make that actual distinction and rule that there is a difference between these types of alerts, but I think the issue really is, and this court can rule anyway, because Bass is contrary to the existing set of law as it stands. The Bass case focused on this issue of affidavits that's in the Illinois Constitution, but as the Braswell case stated and the dissenting justice stated in Bass, that provision is only when you are seeking a warrant do you need to have it supported by affidavit. Probable cause has always been allowed by statute and under the common law, and counsel relied on two cases. The U.S. Supreme Court case was, I believe, Palmer v. New York, as well as an Illinois Supreme Court case, People v. White, in her reply brief that relied on Palmer and stated that, you know, you must have exigent circumstances in order to go into the home and arrest an individual. But those cases were both decided, Palmer was 1980 and White was 1987, in 1990, the U.S. Supreme Court issued New York v. Harris, and in New York v. Harris, the court specifically stated you don't need exigent circumstances. You can go into a person's house, arrest them if you have probable cause, and as long as the statements made by that individual occur not inside the residence, but elsewhere, such as the police station, which was the facts in Harris, that evidence is allowable as long as you had probable cause. So it ultimately goes back to a probable cause determination, not necessarily a constitutional issue. So you don't have to- You've answered my question and your command of the case law is admirable, so thank you. I don't want to waylay your argument any longer. Thank you. And with that, your honor- Continue with your statement though, please. Well, just to briefly conclude on that issue, this court doesn't have to wait on the Bass opinion, because as you know, if you can decide a case on a non-constitutional issue, you're encouraged to do so, and our whole position is that there was sufficient probable cause. There was a trail of breadcrumbs, and while there may be one or two facts here or there that, you know, may appear contradictory or maybe just confused in the manner in which they were made when he reviewed his report during the suppression hearing, even though those things occur, the rule is not every fact has to be proven beyond a reasonable doubt. You only have to have a sufficient indicia of reliability, and all that requires is that a substantial amount of the facts have been corroborated. May I briefly conclude? Please. As far as the facts that were corroborated, we had an instance that happened at the club. The breadcrumbs led to Anthony Carter, who led the police to Driver. Driver said he was with Defendant on the club that night. Defendant had an altercation. Defendant fired the gun, and another witness, Taliki Alliles, confirmed the vehicle and the presence of two individuals there. And with that, I would respectfully request that this court affirm the defendant's conviction, and we'll rest on our brief in the remaining issues. I have one last question. I'm sorry to... Thank you, Mr. Adler. ...belabor this point, but the substantial facts corroborating the information comes from the Tisler case, I think, in Illinois, I believe. Are there any other cases from our third district, and Tisler originated in the third district, that address this 49 message or probable cause arising from the 49 message? As I recall, there were a number of cases that reference these types of investigative alerts. I do not know if our court has issued any decision on the merits other than simply mentioning that they occurred. They've not been raised as an issue before. I think the Bass case referenced that as well. They've created an appendix in that case with a number of them. I do not recall if our court has done anything more than mention it as a fact in passing. That would be an issue if your honor would like supplemental briefing on that issue. Thank you. I appreciate your input on that. No additional briefing is necessary for me. So, Mr. Atwood, to summarize, you're saying that the 49 message isn't an operative fact, right? That is correct. Okay, thank you. Ms. Matuszak, you may reply. Thank you, your honor. Starting with the 49 message, I do just want to be clear on what the facts of this case. Counsel indicated that this was a be on the lookout kind of message. And that is contradicted by the record. Detective Moore said that this was based on probable cause, that they issued the 49 message based on probable cause. And I would submit to the court that if this were in fact, a be on the lookout kind of message, then the officers would not have descended upon Mr. Hardiman's girlfriend's home at seven o'clock in the morning, made... I'm not sure what's happening. I apologize. I apologize. They would not have made it. Entry without consent into the home to arrest. Ms. Matuszak, I think you're losing connectivity on your audio. Okay. I think there's a feedback. I'm sorry. I'm sorry. Now you're here. Now you're here. Can you hear okay? I can hear okay. I can hear okay. There's just suddenly an echo. I'm not sure the technology of that, Ms. Matuszak. Is it still going on? Is it still going on? I believe so. I believe so. Yes, it is. I will try to... I will try. Your Honor, hear me clearly? No, you're breaking in and out. Oh, dear. Audio. I'm able to hear you clearly. Twice. I can hear you clearly. Right. It's an echo. I can hear myself twice as well. And Justice Wright. I can hear myself twice as well. May I proceed? I see it's a little difficult. Oh, please keep trying to proceed. We'll interrupt you if we can't hear you. Thank you. I think it is clear based on what the police did. This 49 message was not a be on the lookout message. They went to Mr. Hardiman's home. In fact, the home of his girlfriend went to the door at seven o'clock in the morning, did not get consent from Mr. Hardiman's girlfriend, Miss Evans. And the state stipulated to that, I believe at the probable cause hearing. And they went into her house, located Mr. Hardiman, arrested him and took him to the police station for interrogation. So this was not just a sort of casual be out on the lookout. If it were, we never raised that issue. And so given the facts that we have, that we have the vehicle leading to Mr. Carter, Mr. Carter says driver and someone named Scoob used my car. And, you know, we go through all the series of events. If we don't consider that this was, you know, put into the form of a 49 alert, but we consider all the things that, you know, the police put together. Whether or not, I mean, I know you're saying that isn't enough for probable cause. You say that because of the format, they said this was a 49 alert, or because you think the totality of all of it is not sufficient to arrest him. Well, I mean, I guess in effect, I'm saying both. I am saying that the, you know, I, that we agree with the bass court, that this kind of circumvention of the warrant requirement is unconstitutional. But in this case, the totality of the circumstances, the totality of the evidence that was known to police at the time that they issued the 49 message and went to Ms. Evans home and arrested Mr. Hardiman was not sufficient for a finding of probable cause. And, you know, there were 24 hours in between the time that Mr. Driver, I think approximately 24 hours in between the time that Mr. Driver made his statement to police and the time that the police went and arrested Mr. Hardiman. I submit that was plenty of time. If the police believed that they had probable cause to arrest, they could have and should have gone to a judge and requested an arrest warrant. They did not do that. And again, we submit that is because they knew that they did not have sufficient probable cause for arrest for Mr. Hardiman. And just, well, I see I'm out of time. I'll finish up because you lost some time. Well, I just wanted to say, I think, you know, the, your honor questioned the earlier altercation in the restroom and, you know, sort of the significance of that. And I think, I mean, that the testimony on that point and that sort of goes to one of the issues that we raised about ineffective assistance for not cross-examining Early Johnson on his initial identification of the person in the bathroom. That information is critical. It is the only thing that in any way suggests that Mr. Hardiman had something to do with the shooting in terms of the evidence presented at trial. That was the so-called motive evidence was the only thing to connect Mr. Hardiman to the shooting of Mr. Hartwell. Well, was driver's statements not presented at trial? They were not. Okay, thank you. That clarifies. So for that and all those reasons and raised in our brief, we'd ask that the court's findings be reversed. Okay, well, thank you, Ms. Patuzak. Thank you, counsel, both for your arguments in this manner will be taken under advisement written dispositional issue. I believe you will be exited from your waiting rooms.